The next case on the calendar this morning is United States v. Jackson. I see two lawyers in front of me. Would you please raise your hand if you hear me? I see two hands. We have read your briefs. We look forward to your arguments. And I believe it is Ms. Moretti, you go first. Good morning, Your Honors. May it please the court, Michelle Moretti for Appellant Giordano Jackson. With the court's permission, I would like to reserve two minutes for rebuttal, and I will watch the court's clock. This court should reverse Mr. Jackson's conviction for kidnapping due to insufficient evidence. It should also reverse count one, the first degree murder charge due to insufficient evidence of premeditation, and then remain the matter for entry of judgment on the lesser included offense of second degree murder. As a preliminary matter, Mr. Jackson never denied that he killed his girlfriend Alvina Nez on the night of September 1st, 2017. In fact, on the next day, September 2nd, he told several people that he did so, including a police officer and dispatcher. He killed her while he was heavily intoxicated. In his words, he was blacked out. In a September 3rd interview strapped to a hospital gurney or Ms. Nez had been drinking a half a gallon of Vitaly on the night that she died. And then in that interview, he also admitted to having hit Ms. Nez with his fist in the past, mostly when he had been drinking. And presumably based on that admission during the course of the murder investigation, the government interviewed the Ms. Nez's aggrieved son, nephew, and father, and discovered that sometime the previous July, two months before the murder, Mr. Jackson had assaulted Ms. Nez. And that gave rise to the assault resulting in serious bodily injury conviction, and the kidnapping charge and conviction. This all occurred... Before we leave the issue of intoxication, wasn't there evidence, to the contrary, that he was not intoxicated? Your Honor, there was... That is the subject of the second issue, and I'd be happy to address that now. I'm just asking you, wasn't there evidence, to the contrary, that he was not intoxicated on the evening of the events in question? No, there was no evidence to the contrary, because the only evidence that he was not intoxicated on the night in question, there was no evidence, because he was first questioned and observed... Go ahead. He was first questioned and observed by officers as much as 24 hours later. And by that time, presumably any alcoholic effects would have worn off, he wouldn't have smelled. And then later that night, after he had cut himself severely in drained blood, he was transferred to a level one trauma center, before of which he was administrated sedative medications. And then sometime very late on September 2nd into September 3rd, now that we're getting into about 24 to 36 hours after when he said he killed Ms. Nez, the hospital admitted a blood test. I thought your client himself said that he had not been drinking on that day, and the fight was really for whether or not there was alcohol effect from drinking the previous day. Isn't that right? He had said on September 2nd, and this was at night, okay, 24 hours, he said, I killed Ms. Nez, my girlfriend, last night. He made that statement on the evening of September 2nd, about the night of September 1st. That's as much as 24 hours later. But did he say he had been drinking on September 1st or no? Did, he was drinking on September 1st. It was very clear. He said that from the beginning. He had been drinking a half gallon of vodka or Vitaly with her. And at some point, he called it blacking out. But there's not necessarily a scientific meaning to blacking out. He could have had memory lapses or any state of confusion. But the argument is that he was sufficiently intoxicated to the level that he was not able to perform the cool and deliberate premeditation sufficient for a finding of first degree murder. Now, the intoxication evidence was the centerpiece of the defendant's sole defense to a finding of premeditation. The government chose to rebut that defense. And the government noticed that it would allow, that it would call treating physicians, not as expert witnesses, but as lay or fact witnesses. Those witnesses, the most important being Dr. Levitin, who is the ER physician with nine years of experience, an attending physician who supervised all of the patients at the hospital, routinely evaluated their whole systems for their treatment, care, and disposition, routinely ordered alcohol and urine screens for people. And also, she had a, she had done a toxicology fellowship at a poison center, at the Bannon Poison Center, before coming into her practice. So she admitted that Mr. Jackson was sedated and confused when he arrived sometime very late on September 2nd or into September 3rd. And at that point, only at that point, that was the first blood alcohol detection test ever done on him. And the government was permitted, or the witness was permitted to answer that the test yielded a blood alcohol level of minus 10, in that anything minus 10, just, or 0.01, rather, or minus 10, if there's a conversion, does not show, there was a degree that did not show up on the blood test. For instance, he could have been, he could have still had residual intoxication of 0.099%, which would be sufficient, for instance, if an airline pilot showed up to work at that level, that residual alcohol would not be tolerated. There was a point at which that test could not detect any residual alcohol. And 36 hours after being arrested, or after committing the murder, after drinking, it is not inconceivable that he would have tested so low. Yet, the government refused, objected, and then eventually the trial court allowed, or disallowed, Mr. Eisenberg from inquiring about the dissipation level of blood alcohol within the bloodstream. Counsel, may I ask you, if Mr. Jackson was blacked out, how did he remember so many details about what happened during the murder, about her falling, and about her gurgling, and about him sitting by her body for a while? If he were blacked out, how could he recall those details? Well, Your Honor, he remembered those details at about 36. Well, at 5 a.m. in the morning on September 3rd. And how many days is that after the murder? But if he was blacked out, why would he have any memory at all? I don't believe that would preclude him from having a flashback, or suddenly remembering some, or having some inclination of what happened. But wouldn't, to follow up on Judge Rollinson's question, wouldn't that testimony as to the details somehow undermine an argument on his behalf that he was so drunk that he didn't know what he was doing? Not necessarily, Your Honor. Well, I'm not talking about necessarily. I'm talking about evidence from which the jury could conclude that he was sufficiently compassed that he could form the intent. There was some evidence that they could, they could evaluate the evidence, for sure, but... And they did. The jury heard all of this and evaluated the evidence, correct? Yes, but they were not permitted to evaluate the key factor that the alcohol dissipates over time. And that was the centerpiece of the defendant's case, to establish that at the time of the murder, despite what happened after, 36 hours later, at the time of the murder, when he struck Ms. Nez, he was out of his mind. Counsel, why didn't the defense call someone to make that point, rather than trying to get it from the emergency room physician? If that was the centerpiece of the case, it would appear that an expert to testify to that would have been called. Well, Your Honor, first, the defendant has no burden to affirmatively, beyond raising or meeting the burden of production for intoxication, has no burden to take the stand or call witnesses. Second, the government noticed that it would be calling this physician. And it was perfectly reasonable for defense counsel to assume that she would be testifying somewhat as to the blood alcohol test that was alluded to in the notice. She said she wasn't qualified to make that decision. So if she isn't qualified to make that, give that opinion, then why is it error for the court to say that she can't be questioned about that? How is that error if that's not within her area of expertise? Well, Your Honor, I've really delved into this in the reply brief. There were several parts to that question. She listed, there was quite a bit of testimony as to her qualifications and her manner of practice in dealing with people with blood alcohol at first. When counsel probed her, she claimed she was indeed qualified. She had studied the rate of alcohol dissipation no more than any other physician trained in emergency medicine would have.  There are cases I've cited in my reply brief where that type of testimony is perfectly presentable by non-expert witnesses, by police officers, or whomever. However, when she equivocated, she said, yes, there is a general rule, and I'm paraphrasing, but there are exceptions. It was only to the exceptions to the general rule that Dr. Levitin claimed she wasn't an expert. Then, counsel probed that, and then he redirected his inquiry back to the general rule. Generally speaking, though, are you familiar with the proposition that alcohol dissipates a rate of 0.15 per hour, which, as I've cited in my reply brief, is a pretty much standard rate. Of course, there are always some exceptions within a certain range. That was very reasonable, and it was very reasonable to assume that an emergency room physician with a toxicology background and nine years of ER experience heading the department would know the general rate of blood alcohol dissipation. Counsel wasn't acting about the exceptions. He was asking about the general rule that would have established the proposition. Counsel, real quick, over here. No, you started off saying you were going to talk about the kidnapping charge, and that was the lead thing in your brief, and we haven't heard anything about it yet. So, I just have a couple quick questions for you on it. Sure. You are urging this court to adopt the Third Circuit's case, Virgin Islands v. Berry, and some of the factors, if I recall correctly. Not precisely, Your Honor. I'm urging this court to define what is considered a substantial seizure for the purpose of a kidnapping statute. As I've explained in the briefs, under the territorial or jurisdictional provision, nothing but a seizure or confinement and holding in Indian County or country is allowed. Well, let me just jump in real quick because we're running out of time here. I understand why in your brief you cite the Berry case from the Third Circuit. That is a very good case for you. Here's my concern, and I know you were not trial counsel. I read through the Rule 29 arguments in this case. I didn't see the Berry case cited to the district court. Was the idea that we should apply these four factors from Berry, based on your review of the record, I understand as appellate counsel, not trial counsel, and maybe if you were trial counsel, maybe you would have actually cited the case, but we are where we are. Did I miss that? Did trial counsel ever actually cite Berry or at least those four factors to put the district court on notice that that's kind of the direction he wanted this case to go? I believe he didn't specifically cite Berry. He didn't specifically cite a four-factor test, but in the course of his Rule 29 motion, he said, I don't believe there was, I believe he said, I don't believe there was a seizure substantial enough to constitute kidnapping under the rule or under the statute. And he cited the city case and distinguished how these facts were very different from the facts in that city. So we're not suggesting that the court should, per se, adopt the Berry rule or there are many different ways that courts have tried to constrain the overbroad reach of kidnapping statutes, otherwise to not do so would lend itself to absurd results where people who have committed a momentary confinement are literally subject to a sentence of life in prison or they're in jeopardy of it, even if they're not so sentenced. So in your view, the point was raised, although the specific formulation that we might or might not come to was not necessarily advanced, but the point was raised that this was not kidnapping because if this is kidnapping, pretty much everything is. And that's exactly that's that's basically right, Your Honor. And that that is the danger and the importance of this court clarifying. And I would note that the kidnapping statute, and this is discussed in the city concurrence, whoever unlawfully seizes, combines, et cetera, and holds the phrase and holds for ransom reward or otherwise, implies some level, some non momentary degree of seizure. And in Chapman and SETI, they've described it as appreciable or substantial. And other courts have done that as well. And even in the courts that my colleague, Mr. the cases my colleague, Mr. Boyd has cited regarding the over the traditionally broad statutory construction, those cases are distinguishable because they they don't generally do not apply to a case where we only have a territorial seizure without some sort of movement, such as. Okay, yeah, we do. We take the point and as argued in your brief, let's hear from the other side and we will give you a chance to respond. Thank you, Your Honor. Mr. Boyd. May it please the court. Good morning, Your Honors. My name is William Boyd. I'm an AUSA from here in Phoenix on behalf of the United States. I heard questions first about the intoxication defense and Dr. Levitin's testimony and then kidnapping. So with the court's permission, I'll try to address those issues in that order as well. In terms of the government's disagreement with the defendant's intoxication defense, I would note a few things. First of all, the jury was instructed on it. There was a jury instruction on voluntary intoxication. They heard the evidence and they rejected it. There was evidence that the defendant had not been drinking that night. On ER 640, this is part of the interview that Special Agent Schultz had with the defendant. The defendant was specifically asked about the timeline. And this is on lines 10 to 13. And his answer was, it was not, not last night, but the night before. So the defendant's interviewed the night of September 2nd to 3rd when he's apprehended. Last night would have been the 1st to the 2nd. He said it was the night before that. So the jury absolutely could have looked at that testimony and concluded he was talking about a different night. I would also note that he was interviewed by the flight nurse for medical purposes before he was flown to the trauma center. He was asked, quote, did you pass out? Were you unconscious at any time? And his response was no. So in addition to many other circumstantial facts in the case, which show the defendant was able to aim eight machete blows at the back of someone's head, that he was able to remember what happened right before she fell down, the act of her falling down, her gurgling after she's fallen down, all the things he did in that time frame. He remembered thinking while he's listening to her gurgle, why don't I call the police? Because I want to try and wait it out a little, a bit longer. The jury can rationally say, you remember all this stuff right before, right during, and right after. And you've given us some other stories about when the drinking was. We can reject that testimony. Then the jury could have disagreed. The jury could have accepted it. They chose not to. And we think the evidence does support that substantially. On the timeline of it, my friend presents this 24 to 36 hour period as supposedly being the time between the murder and that toxicology test. I don't think the jury had to accept that timeline at all. The evidence in the record was that Officer Baldwin, who's the first person to talk with the defendant, and this is the person the defendant first says I've murdered Alvina That call was at 725 p.m. on September 2nd. And the court confided described on ERs 450, 472, and 601 as well. And it's also in the Exhibit 119, which was an extraction of the defendant's cell phone. Counsel? Navajo Police Office. Does the record reflect how long after the murder that call was made? It does not. The record does not have an actual time in there as to when the murder occurred. The defendant didn't give a particular time. And so I think the jury could rationally have concluded that it was some period before that. But it certainly didn't have to believe it was 36 hours before that. Again, the defendant talked about the murder having happened the last night and drinking the night before. So the defendant is apprehended around 930. That's when Lieutenant Lee arrives on the scene and shortly thereafter sees the defendant. He is arrested. He's flown to the trauma center. He's first encountered by Special Agent Schultz around 1 a.m. So I don't think that the jury has to in any way agree that there was a day that passed or a day and a half that passed. But I also note that the jury could also have concluded he was drinking. But the fact that he's drinking doesn't mean he can't premeditate. And the jury can look at all of the things he did remember, all of the stuff he did, and conclude even if you were drinking, you still had the wherewithal to hit her in the back of the head with a machete eight times and remember all the things you remember. So I think there is substantial evidence of premeditation to reject the defendant's intoxication defense. Regarding Dr. Levitan's testimony, I think my friend said the jury was not allowed to consider the key factor that alcohol dissipates over time. And that was not excluded. The district court overruled the Government Foundation objection when that was asked. And this is on the top of ER 527. On 526, the question was asked, how long does it take for blood alcohol to dissipate in the body? That objection is overruled. And the answer is on the top of 427. And at line 5, Dr. Levitan says, but yes, alcohol is metabolized at a certain rate. But that depends on multiple different factors in various people. So the objection that was sustained, which is at the bottom of ER 527, that was this supposed specific general metabolism rate of 0.15%. I think Dr. Levitan, the district court was well within reason. It certainly wasn't plain error, even if the argument was preserved. I think it was well within her discretion to sustain that objection. Dr. Levitan said she couldn't list all the factors. She knew there were factors. But she would have to do research in order to be able to answer them, that there were people who have whole subspecialties to be able to answer that question. And she wasn't an expert. So I think that the sustained objection on that particular point is well within discretion. And also, I think it's hard, given footnote 20 of the reply brief, for the defendant to claim any prejudice. Because the reply brief admits that wasn't even the supposed specific rate that the defense was trying to ask about. So there's no reason to think that Dr. Levitan would have agreed anyway, even if that were true. And again, her testimony was that there is no generalized rate. It depends on different factors and different people. Counsel, if you're going to go to the kidnapping question, I actually would like to start with a hypothetical, if you don't mind. Just because I'm trying to understand how the government interprets this statute. So here's the hypothetical. So I have an 18-year-old daughter, and she has a 40-year-old boyfriend. So we're running off to a great start. So the 18-year-old daughter, 40-year-old boyfriend. I get a call from my daughter. She says, I'm at the post office. And I say, why are you there? She says, because we're going to get a passport because my boyfriend and I are moving to Mexico. I live in San Diego, so that's actually quite possible. They can make it to Mexico pretty fast.  We're federal jurisdiction, U.S. Post Office. And as they're leaving, the boyfriend says, I'm taking your daughter to Mexico, Judge Owens, and you're never going to see her again. And she's doing this willingly. She's not being kidnapped. She's willingly going along with this. So I grab the guy by the wrist, the boyfriend, and I say, not so fast. Okay, so freeze right there. Under the government's theory, and I'm restricting his movement, because I grabbed him by the wrist, and I'm on federal jurisdiction. And there's a benefit to me because I don't want my 18-year-old daughter moving with this 40-year-old man to Mexico. Have I committed a kidnapping under the government's theory in this case? I don't think so, Your Honor. I think you might have seized him. I'm not sure I would even go that far. But certainly under those facts, you haven't committed both of the elements that are described inensity and that the jury was instructed with here. There has to be a seizure. But there does also have to be, as a second element, a holding. So let's say I hold him. Let's say I grab him and I say, I'm not going to let you go. If you're taking my daughter to Mexico, I'm not going to let you go. I think it probably will depend on a lot of the attendant facts, just given those facts and knowing nothing else, whether he's trying to escape or anything along those lines. Certainly, whether you have any justification, excuse or defense or anything along those lines, it's going to depend on how long that goes on, whether he is extremely resisting, what are you saying, other things that are going on. But if you describe it there, it's... But it sounds like... I think the answer to the question is yes, it would be a kidnapping under the government's theory. I am on federal jurisdiction. I'm restraining someone from doing what they want to do. I'm seizing them. I'm holding them. And I'm gaining a benefit from it. I don't want my daughter to go to Mexico with this guy. Isn't that... Wouldn't that satisfy how the jury was instructed in this case? The jury was instructed that there had to be an unlawful seizure and a holding. And so I think that it is, as the Et City case says, it's going to be... And I think all of the cases recognize that it's going to be a highly fact-specific determination. So if we're talking about that, you've grabbed his arm for a few seconds and there's... I didn't say that. This is my kid. I'm going to hold on tight. I guess what I'm trying to ask here is that it seems to me that under the government's theory, that could be a federal kidnapping charge. And it seems to me that's crazy if that's a federal kidnapping charge. So what am I missing here? Well, I think it would be hard to do just based on the facts you provide. I think it would be hard to defend that as a federal kidnapping charge. But I do think that the facts here are very, very different from that. And I think that they are the kinds of facts that... Let me ask a hypothetical that's a little closer here. Let's have a conventional crime. I'm walking through a federal enclave. So again, it's federal jurisdiction. Somebody comes up to me with a gun and says, put up your hands. And then he robs me. Is that a kidnapping? I mean, put up my hands doesn't mean, hey, you're free to walk away. He's hanging on to me. I'm supposed to be there stationary with my hands up so he could take my wallet. Under your theory, is that a kidnapping? If so, why or why not? I will say that, again, without more facts, it would be hard to defend the mere... What more facts? What more facts do you need? Well, I would want to know how long it went on. I would want to know... It's a kind of a normal robbery. The whole thing's over in about three minutes. But during that three minutes, I'm absolutely stationary because he's got his gun on me. I think it might be a kidnapping under those circumstances, Your Honor. If you are seizing someone's body, you're telling them don't move and they're... So that means pretty much every ordinary mugging and robbery on a federal enclave is not only the robbery, but it's also a kidnapping. That intuitively does not strike me as right. I mean, what we have here is a robbery. And people ordinarily don't talk about that as a kidnapping in addition. I don't think it goes that far, Your Honor. I think that the jury does have to be able to find that there is a seizure and that the seizure is a holding and that it continues for some period of time. So, counsel, was the jury in this case instructed that there was a duration requirement? No, the jury was instructed that there had to be holding. And I think I would agree with my friend that implicit in holding is a notion that it is different from the seizure itself. That's why they're separate elements. So the jury was not told it had to find any particular period of time. And I don't think that the case law says that a number of minutes is the answer. I think the court, as it did in Etsody, looks at what happens to this person here in terms of seizure and holding. And the facts that happened in this case are that the victim was dragged out of a car. The jury was allowed to conclude from the evidence that she was stripped virtually naked down to her panties, that she was physically dragged around an area for several minutes where chunks of hair were pulled out of her head. She was left scraped on her face and her arms and her legs. Her body was covered in dirt. She's yelling and screaming. She's trying to get away. That is the same types of facts that we see in Etsody, which, again, there was an assault that was going on there as well. You have somebody who's been dragged. You have somebody who is trying to overcome physical risk, overcome the defendant's physical control. Now, is aspiration part of the federal definition? You're talking about dragging, taking out of the car and so on, which is aspiration. But is that part of the definition? Aspiration is not required. But I do think that when you're moving somebody from one place to another against their will, those are facts you can look at to say, yes, this shows that somebody's bodily movement is being controlled, that they are being held against their will. And I think when you look at the category of facts in this particular case, it absolutely satisfies the kinds of facts necessary to show that her body was seized and that it was held for some period of time. Yes. Let me ask you a different question, if I may. But again, a hypothetical question. Let's take aspiration out of the equation. Somebody comes up behind me and hits me over the head, immobilizing me because it's such a stunning blow. And then he continues to hit me. That lasts for maybe, oh, five minutes. He then leaves me. And after a while, I recover, crawl away and go to the hospital. Is that a kidnapping? He's immobilized me because he hit me. He's made me stay in the same place for quite some time. And he continues to hit me for several minutes. Is that a kidnapping? I don't know that I would defend that as a kidnapping, Your Honor. Again, I think that maybe a jury could look at those facts and say that you were held. But I'm asking you a legal question. The facts are undisputed. I just gave them to you. Well, right. But I think the question, I think, on those facts is whether or not you have been held and whether that element. Let's say while he beat me, he holds me by the wrist to make sure that I don't get up. Yeah, I think that, again, depending on all the facts, and there may be facts that that make it different, you know, in different situations. But I think that if somebody is holding on to you, preventing you from trying to escape and is doing so for a purpose, for instance, for purposes of. Well, he's not trying to get me to escape. There's no way that I'm escaping. But he kind of wants to get my body arranged in a way so he can hit me better. I think that if he is, I think that that would still qualify as as a purpose under the statute. So, again, again, I do think it's going to be very fact specific. I think if you're looking at the, you know, the transient hand on the arm or, you know, something brief like that, I think it would be hard to defend. But there certainly are situations like Etsy, where for purposes of conducting a violent assault, somebody restrains another person's movement by seizing them and holding them and trying to and try to put them on a leash. And trying to put them on a horse and take them away. That's right. That's true. And those were I see my time has expired. Just to briefly respond. Those were absolutely facts in that city. I think here the defendant was said repeatedly to be trying to drag the defendant, the victim out of the car and into the Hogan, into a private place. So, again, we have an attempt to move her from one place to another. So I think that the jury, as instructed, as it was argued below, there is sufficient evidence to sustain the kidnapping conviction. Okay. Thank you very much. Let's put two minutes on the clock for response. Thank you, Your Honor. I will try to address the points in reverse order. First, as to the kidnapping, the court asked what jury instructions were given. They're contained at 5 ER 687. First, the defendant kidnapped, seized or confined, etc. Second, the defendant held Albina Nez for any benefit. Those two elements, not elements, but those two qualities seem to have been merged. And I think that was not clarified because I believe the prosecutor argued that there is no specific duration required of any seizure or confinement. It could be a minute. It could be a day, etc. She went on quite at length. And during the judge's Rule 29 ruling, she also found that no specific duration was required. And I had highlighted those passages in my opening brief. As to Mr. Boyd's allusion to the timeline, I would note the timeline is of crucial importance here. It was not until 5 a.m. on September 3rd that Mr. Jackson interviewed David Schultz, the FBI agent. That's when he said, we were not drinking last night, September 2nd, but the night before, meaning September 1st. That's perfectly consistent with what the defendant had claimed all along that on September 2nd, he stated, last night, I was drunk and I killed my girlfriend. That's very clear with a close examination of the timeline. And it must have been important to the jury because the jury's only question for the court was to request a copy of this transcript, which they were not allowed to have. I see my time has expired. Does the court have any further questions? Any further questions from the bench? No. Okay. Thank you very much. Thank both sides for their very helpful arguments. United States v. Jackson now submitted for decision.
judges: FLETCHER, RAWLINSON, OWENS